J. S62044/19

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN RE:  ADOPTION OF A.A.S.      :    IN THE SUPERIOR COURT OF
IN RE:  ADOPTION OF L.T.S.      :       PENNSYLVANIA
IN RE:  ADOPTION OF D.L.S.      :
                                :       No. 1140 WDA 2019
APPEAL OF:  H.L.C., BIRTH  MOTHER  :

Appeal from the Order Entered June 11, 2019,
in the Court of Common Pleas of Westmoreland County
Orphans' Court Division at No. 7 of 2019, No. 8 of 2019,
No. 9 of 2019

BEFORE:  PANELLA, P.J., KUNSELMAN, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED FEBRUARY 14, 2020**

H.L.C. ("Mother") appeals from the June 11, 2019 order entered in the

Court of Common Pleas of Westmoreland County, Orphans' Court Division,

involuntarily terminating her parental rights to her dependent children, A.A.S.,

female child, born in July 2006; L.T.S., male child, born in May 2008; and

D.L.S., male child, born in April 2009 (collectively, the "Children"), pursuant

to the Adoption Act, 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b).[1]  We affirm.

The trial court set forth the following:

> At all times relevant to the within proceedings, the
> Children resided exclusively with Mother in
> Westmoreland County, Pennsylvania, and [birth
> father] resided in North Carolina.  On February 21,
> 2017, the [Westmoreland County Children's Bureau

---

[1] The record reflects that the trial court also involuntarily terminated birth
father's rights to the Children in the June 11, 2019 order.  The record further
reflects that birth father and Mother were married at the time that the Children
were born.  Birth father is not a party to this appeal.

(the "Agency")] received a referral, citing concerns about the Children's behavior and lack of supervision. On April 6, 2017, the Agency caseworker met Mother at her home. Mother appeared disoriented and had dirt on her face. The Children were not at home and Mother did not know where they were. Garbage was strewn about the home; food, dirty dishes and cat litter was on the floor; plates overflowing with cigarette ashes were on the table; mattresses were on the floor; and spilled food was in the refrigerator. When [L.T.S.] returned home alone, he reported that the other two [c]hildren were playing in an abandoned building; Mother accused [L.T.S.] of lying about his siblings' whereabouts.

The Agency offered services to Mother, and then learned that Mother was going to be evicted by her landlord due to the housing conditions, which included a flea infestation in the home. When Mother failed to move from the premises, which was her father's home, she was arrested and incarcerated on charges of defiant trespassing. At that time, Mother placed the Children in the care of their maternal grandmother.

The Agency caseworker met Mother in jail on April 26, 2017. During that meeting, Mother denied having been evicted, denied the poor condition of the home, and denied that the Children had behavioral issues. Maternal Grandmother needed financial assistance to care for the Children, so the Agency filed a Petition for Dependency on May 9, 2017, alleging that the Children were without proper parental care and control. Specifically, Mother allowed the Children to play in the neighborhood without supervision. In addition to the poor housing conditions, the Children played with hypodermic needles with Mother's knowledge and she showed no concern for their safety. The Children were lagging behind in school and required tutoring. Although [L.T.S.] was diagnosed with Autism Spectrum Disorder, Mother failed to seek treatment or special education for him. In addition, [L.T.S.] had behavioral problems that were not being addressed: he was physically

aggressive, and striking, biting and kicking Mother; and he suffered from panic attacks. Because he had such poor hygiene, his teacher provided him with a comb and toothbrush to use while at school.

Mother appeared to have untreated mental health issues. Her behavior resulted in a Protection from Abuse Order being entered on January 4, 2016, prohibiting her from having contact with a former paramour.

Agency caseworker Robert Allison was assigned this case on May 1, 2017. Although he had no concerns about drug and alcohol use, he had concerns about Mother's mental health. He reported that the Children were doing well at their maternal grandmother's home. . . .

The Agency contracted with Timothy Kramer, a placement specialist with Project STAR at the Children's Institute, to provide Mother with services, including parenting instruction, home maintenance, housing, and connections to community resources. When he attempted to communicate with Mother on April 12, 2017, she declined to speak with him. He met Mother again on June 19, 2017, and eventually she agreed to go to a homeless shelter in Uniontown. He continued to try to offer assistance to Mother.

At the Adjudication and Disposition hearing held on June 23, 2017, the Children were adjudicated dependent with continued placement in the kinship home of the maternal grandmother, Ms. [K.], the pre-adoptive parent.

At the conclusion of the Adjudication and Disposition hearing held on June 23, 2017, Mother was directed to undergo a mental health evaluation and comply with any recommended treatment; to participate in parenting instruction until successful completion; to obtain stable and appropriate housing and keep it in a safe and clean manner; and to secure a verifiable source of legal income.

. . . .

At a Permanency Review Hearing held on December 11, 2017, the Juvenile Court Hearing Officer made the following findings with regard to Mother's compliance and progress during the preceding 6 months, which are summarized as follows: Mother had minimal compliance with the permanency plan as she was incarcerated from September 29, 2017, until November 28, 2017. She did not participate in the hearing. She had no housing or source of income. As of December 6, 2017, she was living at the Welcome Home Shelter. She was not receiving any mental health treatment. She did not engage in any parenting instruction. During the entire 6-month review period, she had only 3 visits with the Children.

. . . .

At the conclusion of the Permanency Review Hearing held on December 11, 2017, Mother was directed to continue with mental health treatment or individual counseling until successfully discharged; to undergo a mental health or psychiatric evaluation and comply with any recommended treatment; to participate in parenting instruction; to obtain and maintain stable and appropriate housing and keep it in a safe and clean manner; and to secure and maintain a verifiable source of legal income.

. . . .

At a Permanency Review Hearing held on June 20, 2018, the Juvenile Court Hearing Officer made the following findings with regard to Mother's compliance and progress during the preceding 6 months, which are summarized as follows: Mother had minimal compliance with the permanency plan in that she continued to struggle with obtaining housing and was residing at Pathway Homeless Shelter in Indiana County. She was unemployed and had no source of income. She continued to refuse to have a mental health evaluation. For a period of 5 months, she had

no visits with the Children. Then in May 2018, she began to receive parenting instruction through Justice Works, and had 5 supervised visits since then, although the oldest [c]hild, [A.A.S.], refused to attend visits with Mother.

. . . .

At the conclusion of the Permanency Review Hearing held on June 20, 2018, the Agency was directed to begin therapeutic supervised visits for Mother with [A.A.S.]. Mother was directed to undergo a mental health evaluation and comply with any recommended treatment; to participate in parenting instruction, until successful completion; to obtain and maintain stable and appropriate housing and keep it in a safe and clean manner; and to secure and maintain a verifiable and legal source of income. The Order appointing legal counsel for Mother was vacated because Mother discharged her counsel at the hearing.

. . . .

At a Permanency Review Hearing held on January 14, 2019, the Juvenile Court Hearing Officer made the following findings with regard to Mother's compliance and progress during the preceding 6 months, which are summarized as follows: Mother had minimal compliance with the permanency plan as Mother continued to have no stable housing. She was residing with her father, but that was only temporary. She was unemployed and had no source of income. She was not cooperating with Justice Works to attempt to alleviate her housing and unemployment issues. To the contrary, she stated that she does not wish to be employed and desires to be a "stay-at-home Mother." She refused to have a mental health evaluation and denies that there are any issues or concerns with regard to her mental health, her parenting ability, her lack of housing and lack of income. Mother did cooperate with 13 out of 14 parenting sessions with Justice Works, and attended 19 out of 25 visits with the Children. She also participated in family therapy with [A.A.S.].

- 5 -

. . . .

At the conclusion of the Permanency Review Hearing held on January 14, 2019, the Court directed that [A.A.S.'s] visits with Mother be therapeutically supervised and occur separately from her brothers' visits with Mother. Mother was directed to undergo a psychiatric evaluation and comply with any recommended treatment; to participate in parenting instruction until successful completion; to participate in life skills services, including instruction on home maintenance and budgeting, and connections to community resources; to obtain and maintain stable and appropriate housing and keep it in a safe and clean manner; and to secure and maintain a verifiable and legal source of income.

. . . .

ViJaya Greene, MPC, a Behavioral Health Clinician with Project STAR at The Children's Institute, had 11 bi-weekly therapy sessions with [D.L.S.] from November 15, 2017, though April 30, 2018. Ms. Greene testified as follows. The objective of [D.L.S.'s] therapy was to address issues related to emotional regulation and trauma. During the period of time Ms. Greene worked with [D.L.S.], [birth f]ather was in contact with the Children, and [D.L.S.] was excited about the possibility of moving to North Carolina to live with his [birth f]ather. As time passed, [D.L.S.] was becoming indifferent toward his Mother, and he expressed no concern about leaving Pennsylvania or his Mother in order to reside with [birth f]ather. . . .

Rayna Carter, M.S.Ed., NCC, LPC, a Behavioral Health Clinician with Project STAR at The Children's Institute, had 22 therapy sessions with [A.A.S.] from November 15, 2017, through July 23, 2018. Ms. Carter testified to the following[:] In the beginning, [A.A.S.] talked positively about her rekindled relationship with her Father. She said she spoke to him almost every day and desired to spend

more time with him. She did not talk about her Mother, but when asked, said that she was not interested in talking to her. She was very angry, and felt like she had had to be the parent. She referred to her Mother by her first name, and had no misgivings about leaving her Mother. . . . In mid-April 2018, [A.A.S.] began to refuse to participate in supervised visits with her Mother. [A.A.S.] did not want to move to North Carolina [to reside with birth father]; she was interested in maintaining a relationship with her [birth f]ather, but she wanted to continue living with Maternal Grandmother. When Maternal Grandmother was hesitant to accept permanent responsibility for the care of the Children, [A.A.S.] stated that she would prefer to go into foster care rather than live with [birth f]ather because his explosive temper scared her. During her last therapy session with [A.A.S.], Ms. Carter explained that a new therapist has been assigned to her case to provide reconciliation therapy to [A.A.S.] and her Mother. [A.A.S.] was reluctant to have either supervised visitation or reconciliation therapy with her Mother.

Bethany Marie Crile, M.A., NCC, a Behavioral Health Clinician with Project STAR at The Children's Institute, worked with [A.A.S.] and [D.L.S.] on issues relating to past trauma, anger and aggression, and their ability to articulate feelings in an appropriate way. Ms. Crile testified to the following[:] [A.A.S. and D.L.S.] attended 25 therapy sessions from September 11, 2018, through May 2, 2019. Ms. Crile observed that Grandmother's and [A.A.S.'s] relationship had strengthened, peer relationships improved, and [A.A.S.'s] grades improved. [A.A.S. and D.L.S.] do not indicate that they have any attachment to Mother. To the contrary, they argue over not speaking to their Mother when she calls.

Rachel Johnston of Justice Works YouthCare provided housing, community resources and supervised visitation to the Family from May 27, 2018, through August 26, 2018. She testified as follows[:] Ms. Johnston attempted to rebuild the relationship between Mother and the Children. [A.A.S.] did not

want to be touched at all by her Mother, and she physically threatened her. Mother continued to maintain that she was a "stay-at-home" Mom, that she did not need a job, and that she would find a husband to help her. Mother's source of income was unknown, and for periods of time she resided in homeless shelters, despite Ms. Johnston's efforts to help her. Mother insisted that she needed a 7-bedroom house, which was an unrealistic expectation for a woman of her limited financial means. Mother would not complete a mental health evaluation, and would not complete the tasks assigned to her.

Courtney Knox of Justice Works YouthCare provided housing, community resources and supervised visitation to the Family beginning in August 2018, and continuing through December 2018. She testified as follows[:] Ms. Knox attempted to work with Mother in obtaining a mental health evaluation, housing and help through Family Behavioral Resources, but Mother refused to comply or cooperate. Mother attended 19 out of 25 scheduled supervised visits. She had appropriate interactions with [D.L.S.] and [L.T.S.] during those visits, but she had difficulty with discipline and setting boundaries. Mother and [A.A.S.] did not interact well with one another, and a therapist from King and Associates intervened. When Mother would not agree to guidelines established by the therapist to govern her interactions with [A.A.S.] during visits, the visit was cancelled on August 2, 2018. Ms. Knox stated that from August 2018 to December 2018, Mother made no progress in improving her interactions with the Children.

Mary O'Hara, LSW, a social worker with King and Associates, began to work with Mother and [A.A.S.] in September 2018. Ms. O'Hara testified as follows[:] Mother continued to refuse to have a mental health evaluation. When Ms. O'Hara tried to explain the steps Mother must take toward the goal of reunification with her Children, the Children yelled, "I don't want to live with her, she's boring!" and asked multiple times not to be returned to her. Mother

frequently touched the Children when they did not want to be touched or held, which made the Children increasingly upset. Mother's relationship with [A.A.S.] did not improve. In general, Mother was not compliant with services offered to her.

Kelsey Dolan, LSW, a social worker with King and Associates, provided six (6) therapeutic supervised visits to Mother and the Children from December 10, 2018, through April 22, 2019. Ms. Dolan testified as follows[:] Throughout this period of time, Mother continued to demonstrate a lack of parenting abilities. She was unable to provide appropriate boundaries for the Children. She ignored the clinician's prompts and suggestions for establishing boundaries and rules. Mother's thoughts and reasoning were distorted and not reality-based, in that she refused to seek employment, and continued to maintain that she would be a "stay-at-home Mom," despite the fact that she had no home and no domestic partner on whom she could rely financially. She insisted that the Children be returned to her, and told the Children they would be coming home with her soon. During the April 22, 2019, visit, the Children were eager to end the visit and frequently asked, "How many more minutes are left?" and "What time do we leave?" Ms. Dolan recommended that the visits decrease in frequency to assist Mother, Ms. Knopf and the Children in the transition toward termination of Mother's parental rights. Again, she recommended that Mother undergo a mental health evaluation.

Mother testified at the hearing on the termination petition as follow[:] She is 37 years old and has a high school diploma. She is currently separated from her spouse, who is her youngest son['s] father.[2] Although she was employed before she had children, she is now a "stay-at-home Mom." She said that she was hoping to get back together with [her youngest

---

[2] The record reflects that Mother's youngest son is her fourth child. The record also indicates that at the time of the termination proceeding, that child's birth father had instituted a custody action against Mother. (**See** notes of testimony, 5/23/19 at 156-160.)

son's birth] father, presumably as a solution to her lack of housing and income. She believed that a criminal court judge decided in April 2019 that she did not have to have a mental health evaluation, and provided that as her excuse for failing to comply with the prior Orders of Court directing her to have one. She believed that the current proceeding would result in the Children being returned to live with her, despite the fact that she had no home and was residing in a homeless shelter. She did not appear to understand the nature of the termination proceeding. She denied being under the influence of any medication, but many of her perceptions and representations were not reality-based and [were] distorted. She did not appear to be aware of the gravity of the situation. She maintained that she loves [the C]hildren and wants them to be returned to her.

Without the benefit of a thorough mental health evaluation, the etiology and nature of Mother's mental health issues are unclear, yet she did not appear to be stable, sensible, coherent or well-adjusted. It was unclear whether she lacked credibility, whether her mental health interferes with her ability to accurately state the facts, or both.

Robert Allison, the Agency caseworker, reported that prior to the hearing on May 23, 2019, the Children stated they would prefer to continue living with their Grandmother and wished to be adopted by her. The Children are making progress in their Grandmother's home and their needs are being met.

It is unclear whether Mother has made any financial contribution to the care of the Children since they have been in Agency custody.

It is unclear whether Mother has given any cards or gifts to the Children since they have been in Agency custody.

Other than for brief periods of time during supervised visitation, neither Mother nor [birth f]ather has

- 10 -

performed any parental duties on behalf of the Children for over 12 months.

By Order of Court dated January 25, 2019, [the trial c]ourt appointed Catholic Charities of the Diocese of Pittsburgh to provide counseling services to Mother relative to the upcoming termination proceeding. Despite making several attempts to reach out to her, no successful contact was made, and as a result, no counseling services were provided.

The Children's Guardian ad litem, Diane Murphy, Esq., reports that the Children want to be adopted by their maternal Grandmother. Ms. Murphy believes this would be in the Children's best interests.

The Children's attorney, Emily L. Smarto, Esq., reports that the Children want to be adopted by their maternal Grandmother.[3]

---

[3] We note that the trial court entered one order terminating Mother's parental rights to A.A.S. at No. 7 of 2019 ("No. 7."), L.T.S. at No. 8 of 2019 ("No. 8"), and D.L.S. at No. 9 of 2019 ("No. 9"). The certified record at No. 8 contains an original notice of appeal with a caption that lists all three docket numbers. The certified record at No. 7 contains a photocopy of the notice of appeal filed at No. 8. The certified record at No. 9 contains a photocopy of the notice of appeal filed in No. 8. Therefore, Mother filed a notice of appeal listing three docket numbers in each docket below. Subsequently, on August 14, 2019, this court in **Commonwealth v. Creese**, 216 A.3d 1142 (Pa.Super. 2019), interpreted **Commonwealth v. Walker**, 185 A.3d 969, 977 (Pa. 2018) (holding that quashal is required where litigants fail to file separate notices of appeal from an order resolving issues on more than one docket number), as prohibiting us from accepting a notice of appeal listing multiple docket numbers, even if a separate notice of appeal is filed in each docket, as was done by Mother in the appeal before us. Because Mother filed her notice of appeal prior to **Creese** being decided, previous decisional law may have been unclear insofar as requiring Mother to list only one docket number on each notice of appeal. We further note that after **Walker** and before **Creese**, this court did not quash an appeal where an appellant filed a notice of appeal bearing multiple docket numbers in each docket. Moreover, this is a Children's Fast Track appeal that involves the lives of children. In such appeals, this court has traditionally considered the disposition of a defective notice of appeal on a case-by-case basis and has declined to dismiss or quash when the defect does not prejudice the other parties. **See In re K.T.E.L.**, 983 A.2d

Order of termination, 6/11/19 at 4-17 (paragraph numbering, record citations, and footnotes omitted).

Mother raises the following issue:

> Whether the trial court erred in finding by clear and convincing evidence that the Agency met its burden, under 23 Pa.C.S.[A.] §2511(b)?

Mother's brief at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." **In re Adoption of S.P.**, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." **Id.** "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." **Id.** The trial court's decision, however, should not be reversed merely because the record would support a different result. **Id.** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. **See In re R.J.T.**, 9 A.3d [1179, 1190 (Pa. 2010)].

---

745, 747 (Pa.Super. 2009) (holding that failure to file a Rule 1925(b) statement concurrently with a Children's Fast Track appeal is considered a defective notice of appeal, to be disposed of on a case-by-case basis, but did not result in dismissal or quashal where there was no prejudice to the other parties as a result of the late filing). Therefore, we decline to quash this appeal based on noncompliance with Rule 341 because Mother filed her notices of appeal prior to **Creese** being decided and this is a Children's Fast Track appeal.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is guided by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **In re C.S.**, 761 A.2d 1197, 1201 (Pa.Super. 2000) (**en banc**), quoting **Matter of Adoption of Charles E.D.M. II**, 708 A.2d 88, 91 (Pa. 1998).

Here, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), and (8), as well as (b). In her brief to this court, Mother only challenges the termination under Section 2511(b). Therefore, Mother waives any challenge to Section 2511(a). **See Krebs v. United Refining Co.**, 893 A.2d 776, 797 (Pa.Super. 2006) (reiterating that "[w]e will not ordinarily consider any issue if it has not been set forth in or suggested by an appellate brief's statement of questions involved, Pa.R.A.P. 2116(a)").

Even if Mother had not waived her challenge under Section 2511(a), we would find that competent record evidence supports the trial court's decision to terminate Mother's parental rights under Section 2511(a)(2). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa.Super. 2004) (**en banc**) (restating long-standing rule that in order to affirm parental termination rights, we need only agree with trial court as to any one subsection of Section 2511(a), as well as Section 2511(b)).

Subsections 2511(a)(2) and (b), provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

This court has explained the Section 2511(a)(2) inquiry, as follows:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015), quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

Here, competent record evidence demonstrates that Mother has only minimally complied with her permanency goals. It further demonstrates that Mother has consistently refused to undergo a mental-health evaluation, to obtain employment, and to secure stable housing. Mother continues to insist that she is a stay-at-home mother even though she has been living in homeless shelter and has no financial means to support the Children and no intention and/or desire to obtain employment. Therefore, even if Mother did not waive her challenge under Section 2511(a)(2), we would conclude that the record supports the trial court's factual findings and that the trial court did not abuse its discretion in terminating Mother's parental rights under Section 2511(a)(2). The record demonstrates that the conditions that existed

upon removal establish repeated and continued incapacity, abuse, neglect, or refusal of Mother that caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. The record also supports the trial court's conclusion that Mother continued to lack capacity to parent the Children.

We now turn to whether termination was proper under Section 2511(b). As to that section, our supreme court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M.*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219, quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted).

Our supreme court has stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268. The court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

Here, Mother contends that the trial court abused its discretion when it terminated her parental rights under Section 2511(b) because "the testimony establishes that during visitation[,] Mother would show affection to the [C]hildren and the [C]hildren would show affection to her." (Mother's brief at 10.) Mother's contention, however, fails to address the primary consideration under Section 2511(b), which is the Children's developmental, physical, and emotional needs and welfare.

Here, the record supports the trial court's determination that termination of Mother's parental rights is in the Children's best interests. As set forth by the trial court and as supported by the record,

> the emotional bond between the Mother and the Children, to the limited extent there is one, does not indicate a beneficial relationship. The Children do not want to spend time with her. They count down the minutes before they get to leave when they are visiting with her. They argue about whether they have to talk to her on the phone. They desire to be adopted by their Grandmother.

Order of termination, 6/11/19 at 19, ¶ 62. Indeed, Children's guardian *ad litem* reported that the Children desire to be adopted by their maternal grandmother and that this would be in their best interest.

Based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under Sections 2511(a)(2) and (b).

Order affirmed.

J. S62044/19

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/14/2020